UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
IRVING G. HOGANS, on behalf of
RONALD HOGANS, deceased,                                  MEMORANDUM
                            Plaintiff,                    & ORDER


              -against-
                                                          04 CV 736 (SLT) (RLM)

JO ANNE B. BARNHART,
Commissioner of Social Security,

                            Defendant.
------------------------------------------------X
TOWNES, U.S.D.J.

  Plaintiff seeks review of the Social Security Commissioner's denial of his disability

insurance benefit claims.  The Commissioner has moved for judgment on the pleadings affirming

the denial of benefits.  Plaintiff has cross-moved for an award of benefits or, in the alternative,

for a remand for further proceedings.  Based on the written submissions of the parties and oral

argument held on April 22, 2005, and for the reasons set forth below, the Commissioner's

motion is GRANTED.


I.  Facts and Procedural History

  Ronald Hogans ("Hogans") filed an application for disability insurance benefits on

October 9, 1984, which was denied originally and upon reconsideration.  (Tr. 13.)

Administrative Law Judge ("ALJ") Sidney Fenster denied his claim on April 22, 1985 after a

hearing.  (Id.)  Hogans did not appeal the ALJ's decision.

  Hogans' application was reopened for review in accordance with the terms of the class

action settlement in *Stieberger v. Sullivan*, 801 F. Supp. 1079 (S.D.N.Y. 1992). The Commissioner denied Hogans' reopened claim on January 31, 2000. (Tr. 110-11.) ALJ Martin Kahn held an administrative hearing to review the denial of Hogans' claim on November 20, 2001, but adjourned the hearing before any testimony was given to provide the medical expert, Dr. Justin Willer, with more time to review the medical records. (Tr. 35-43.) Hogans passed away on January 8, 2002, as a result of a cerebral hemorrhage brought on by hypertension and atherosclerotic cardiovascular disease. (Tr. 348.) A second hearing was held on March 5, 2002, with Hogans' brother Irving Hogans ("Plaintiff") standing in the deceased's shoes in bringing his claim. (Tr. 44, 46.) Plaintiff testified at the hearing, as did Dr. Willer and Andrew Pasternak, a vocational expert. (*Id.*) ALJ Kahn issued a decision on March 22, 2002 holding that Hogans was not disabled at any time during the *Stieberger* review period (May 1, 1989 to March 22, 2002).[1] (Tr. 10-22.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on December 19, 2003. (Tr. 4-7.) Plaintiff then filed this action requesting review of ALJ Kahn's decision on February 23, 2004.

Hogans was born on December 24, 1939. (Tr. 10.) He completed high school and spent three years in the Navy. (Tr. 137, 86, 170-73.) Hogans was employed as a mail carrier for the United States Post Office from approximately 1962 to 1972. (Tr. 169.) He then worked for the Department of Sanitation as a garbage truck driver and loader from 1972 until 1984, when he was granted ordinary disability retirement. (Tr. 132, 169.)

---

[1] Under the terms of the *Stieberger* settlement, the SSA is required to develop the record for the period encompassing the four years preceding the request for reopening through the final determination of benefits. *Stieberger*, 801 F. Supp. at 1081.

A. Medical Evidence

On December 24, 1980, Hogans fell while working and struck his head. (Tr. 323, 345-46.) X-rays taken at the emergency room following the accident revealed no cranial fractures. (Tr. 324.) Over the next several months, Hogans was seen by Dr. Walter Sencer numerous times for complaints of headaches and episodic losses of consciousness that he termed "blackouts." (Tr. 223-24, 226, 228-29.) Neurological examinations revealed no abnormalities and multiple EEGs came back normal. (Tr. 224, 229.) In March 1981 Dr. Sencer prescribed Dilantin, an anti-seizure medication, to treat his blackouts, though it appears that Hogans did not fill the prescription until at least one month later. (Tr. 224, 226.) Despite the fact that repeated neurological exams came back normal, Hogans continued to report having blackouts and as a result Dr. Sencer advised in May and June of 1981 that Hogans could not work near dangerous equipment and should not drive. (Tr. 223, 239.) Hogans continued to complain of headaches and occasional seizures. (Tr. 277-82, 285.) After examining Hogans on August 19, 1981, Dr. Howard Moscovitz from the Sanitation Department concluded that Hogans could no longer perform the duties attendant to his position as a sanitation worker and recommended ordinary disability retirement. (Tr. 222.) Nonetheless, on September 10, 1981, Dr. Sencer reported that Hogans had had no further seizures, though he continued to complain of headaches, and that he would only need to been seen by him once a year. (Tr. 221.)

After Hogans reported suffering another seizure on February 11, 1982, the New York City Employees' Retirement System ("NYCERS") Medical Board examined Hogans for purposes of determining whether he qualified for disability retirement. (Tr. 308-10.) While Hogans did exhibit some swaying and came close to falling at times, neurological findings were generally unremarkable and the Board denied the application for disability retirement due to the

lack of objective findings as to the cause of Hogans' symptoms, despite concluding that something could be seriously wrong with him. (*Id.*)

A February 1982 CT scan revealed a slight asymmetry in the size of Hogans' lateral ventricles, but this was noted to possibly represent a developmental anomaly rather than pathology. (Tr. 319.) The Sanitation Department referred Hogans to Dr. Jay Rosenblum, who noted that Hogans reported experiencing an average of twenty blackouts per year since the accident, even while taking the Dilantin. (Tr. 218-19.) Hogans denied tongue biting, incontinence, and shaking all over. (Tr. 219.) Neurological examination and EEG testing produced normal results. (Tr. 219-20, 320.) Dr. Rosenblum advised that Hogans could not drive or work near dangerous equipment. (Tr. 220.)

Dr. Thomas Murphy examined Hogans several times between March and August 1982. (Tr. 233-237.) Dr. Murphy diagnosed Hogans with cephalalgia, or headaches, but found no neurological abnormalities and concluded after each visit that Hogans could return to work. (*Id.*)

The Medical Board re-examined Hogans on September 16, 1982, where it noted no neurological deficits or difficulties maintaining an upright posture. (Tr. 311-312.) The Board sent Hogans for further neurological evaluation, the objective results of which were essentially normal, though Dr. Paul Slosberg did observe Hogans sway while standing. (Tr. 216-17.) During compression testing Hogans reported increased headaches, dizziness, and blurred vision, and stated that he blacked out for a minute, but no objective changes were noted. (Tr. 217.) Dr. Slosberg concluded that there was no objective evidence of neurological disease, that the CT scan was normal, and that psychogenic factors were present. (*Id.*) After reviewing Dr. Slosberg's findings, the Medical Board reaffirmed its recommendation that Hogans' application for disability retirement be denied. (Tr. 313-14.)

On March 5, 1983, Hogans went to the emergency room and reported that he had lost consciousness and fallen on his back. (Tr. 327-28.) An X-ray did not reveal a fracture or dislocation and no neurological deficits were found. (Tr. 330.) Hogans was diagnosed with a soft tissue injury and released. (Tr. 328-29.) Three weeks later, Dr. Murphy diagnosed Hogans with cervical spine pain and recurrent, severe cephalalgia. (Tr. 231.) Dr. Murphy stated that Hogans was unable to work and did not state when he would be able to return to work. (*Id.*) On April 22, 1983, Dr. Murphy diagnosed Hogans with migraines and lumbar myofascitis. (Tr. 230.)

Dr. Daniel Schapiro examined Hogans on May 19, 1983. (Tr. 213.) Neurological examination was within normal limits, and the doctor opined that even Hogans' swaying indicated voluntary reduction of effort. (Tr. 214.) Dr. Schapiro held that he could not give an opinion as to whether Hogans was disabled because it had not been established that Hogans had a bona fide seizure disorder. (Tr. 215.) Dr. Schapiro was also skeptical that the 1980 accident could cause a seizure disorder. (*Id.*)

A May 25, 1983 neurological examination by Dr. Jonathan Charney was normal, as were motor and sensory examinations, except for some back tenderness. (Tr. 341-42.) At this visit Hogans reported that he required a cane after falling during the March 5th blackout. (Tr. 341.) Hogans denied experiencing any aura, tonic clonic contractions, tongue biting or incontinence in association with his losing consciousness. (*Id.*) Dr. Charney diagnosed Hogans with episodic losses of consciousness of unknown etiology that were not seizures and not the result of the 1980 accident. (Tr. 342.) Dr. Charney held that Dilantin had not been effective in preventing the blackouts and that because Hogans worked around heavy machinery he was disabled and could no longer perform his duties. (*Id.*) Dr. Charney also recommended a psychiatric evaluation. (*Id.*)

Dr. Hyman Donnenfeld examined Hogans on June 3, 1983 and found no neurological abnormalities. (Tr. 339-40.) Hogans reported that he was still experiencing 1-3 seizures per month despite taking the Dilantin, along with persistent headaches. (*Id.*) However, Dr. Donnenfeld concluded that Hogans' clinical history and medical findings were not consistent with a seizure disorder. (Tr. 340.)

Medical progress notes made between June 1983 and April 1984 document inconsistent reports of the frequency of Hogans' seizures, with one report noting the frequency at one every two months, another at 0-1 times monthly, and a third from June 1983 noting no recent seizures. (Tr. 249, 256, 258.) The medical progress notes indicate that Hogans should not drive or work in dangerous areas, and some further advise that he not work alone at night. (Tr. 156-58, 254.)

Dr. Sencer examined Hogans again on May 16, 1984 and found nothing objectively abnormal. (Tr. 147.) Hogans told Dr. Sencer that his headaches had persisted since the doctor had last examined him in September 1981 and that he had had at least 10-12 blackout since that time. (*Id.*) Dr Sencer ordered an EEG, which came back normal, and a test for Dilantin levels, which revealed that the level of the drug in his blood stream was non-therapeutic. (Tr. 152, 160.) Hogans was again advised not to drive. (Tr. 152.)

On September 25, 1984, the NYCERS Medical Board re-examined Hogans in connection with his application for ordinary disability retirement. (Tr. 315-16.) Hogans reported that he had been experiencing approximately thirty seizures per year prior to beginning Dilantin treatment but that since then he had experienced only about ten per year. (Tr. 315.) During the examination, the Medical Board noted that marked ataxia suddenly appeared, characterized by stiff gait and falling to the right. (Tr. 315-16.) A Rhomberg's test was positive, Hogans appeared dazed and slurred his speech, and clonus was present in both legs with marked

exaggeration of the deep tendon reflexes. (*Id.*) The episode lasted 6-8 minutes. (*Id.*) The Medical Board held that the episode provided it with the objective evidence needed to substantiate the presence of a seizure disorder and recommended approval of Hogans' application for ordinary disability retirement. (Tr. 316.)

There is no medical evidence in the record from the time of Hogans' retirement in 1984 until the reopening of his disability claim pursuant to the *Stieberger* decision. A consultative examination performed by Dr. B. Patterson-Marshall on December 7, 1999 produced unremarkable neurological findings. (Tr. 161-62.) Hogans reported that he had suffered from headaches on and off for twenty years and that he still had seizures but could not provide a frequency for the blackouts. (Tr. 161.) Hogans reported that no one had witnessed his seizures but that someone had told him he "shook for a little bit." (*Id.*) Hogans described experiencing a post-ictal state resembling waking up from sleep, he denied any incontinence, and did not know whether he bit his tongue. (*Id.*) Hogans said he was not compliant with his Dilantin regimen because he did not feel that it worked. (*Id.*) Hogans could not remember his last hospitalization but knew that he had been hospitalized in the 1980s. (*Id.*) Hogans said he spent his days watching television and going to the racetrack. (*Id.*) Dr. Patterson-Marshall concluded that Hogans would need to avoid heavy machinery and "other activities which would be a danger to himself and others." (Tr. 162.) The doctor also noted that arrangements would be made to send Hogans to the emergency room for his elevated blood pressure after systolic readings of 220/120 and 230/130. (*Id.*)

Hogans was examined by Dr. Harold Schechter on April 18, 2001, at the request of his attorney. (Tr. 300.) In a letter dated November 15, 2001, Dr. Schechter reported that Hogans developed a Grand Mal seizure disorder subsequent to his 1980 accident and suffered five to six

seizures a week at that time despite being treated with Dilantin. (*Id.*) Dr. Schechter noted that

Hogans currently suffered from approximately two seizures per week but that he was not seeing

any doctors or taking any medication, as he had stopped taking Dilantin after he retired. (*Id.*)

Hogans reported experiencing occasional tongue biting and incontinence during his seizures as

well as a period of post-ictal confusion. (*Id.*) Hogans also reported frequent headaches. (*Id.*)

Dr. Schechter found no neurological abnormalities but nonetheless diagnosed Hogans with

Grand Mal seizure disorder which was not controlled by medication as well as hypertension

based on his blood pressure reading of 200/110. (Tr. 304-05.) Dr. Schechter opined that Hogans

was totally disabled and that his seizure disorder met the listing criteria of 11.02 for epilepsy.

(Tr. 305.) Dr. Schechter urged Hogans to seek immediate attention for his hypertension. (*Id.*)

  B.  Hearing Testimony

  At the administrative hearing held on March 5, 2002, the ALJ's medical expert Dr. Willer

testified that while Hogans experienced episodes where he lost consciousness, a definitive

diagnosis was never established, partly due to the fact that the two EEGs were improperly

performed while awake, negating their utility in detecting an epileptic disorder, and partly due to

a failure to investigate other causes for the blackouts. (Tr. 57-58.) Dr. Willer postulated that the

losses of consciousness may have been due to transient ischemic attacks ("TIAs"), or "mini-

strokes" brought on by Hogans' elevated blood pressure. (Tr. 58-61.) Dr. Willer testified that

due to the uncertainty of the diagnosis it was difficult for him to say whether Hogans'

impairment met any of the listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1, but that

based on the record before him he would have to say that it did not. (59.) Dr. Willer testified

that the only restriction he could testify to with certainty was that Hogans could not drive a car or

operate heavy machinery. (*Id.*) He then went on to state that Hogans could not work with power

tools, heavy machinery, or perform any job that would result in him being injured if he lost

consciousness while performing it. (*Id.*) Dr. Willer further noted that it was difficult to tell how

effective the Dilantin treatment had been in controlling Hogans' seizures because there was

evidence that he had not always been compliant in taking it. (Tr. 68-69.) During cross-

examination, Dr. Willer testified that the episode observed by the NYCERS Medical Board was

not consistent with a seizure but represented a "clear-cut description of a mini-stroke." (Tr. 76.)

Dr. Willer stated that Hogans' impairment would not make it dangerous for him to be standing in

a room with sharp or other stationary objects. (Tr. 79-80.)

Andrew Pasternak, a vocational expert, also testified at the March hearing. Mr. Pasternak

testified that Hogans' job as a sanitation worker had both medium (driving) and very heavy

(loading) physical exertional requirements and that his prior postal job required medium

exertional capacity. (Tr. 86.) Mr. Pasternak stated that Hogans' only transferable skill from

those jobs would be driving. (Tr. 87.) The ALJ postulated a hypothetical question regarding the

employment capabilities of a forty-four year-old claimant with a high school education and

episodes of losing consciousness who had to avoid heights, moving machinery and driving but

who retained the residual functional capacity ("RFC") to perform light work, including sitting,

walking, and standing for six hours and lifting up to twenty pounds. (*Id.*) Mr. Pasternak stated

that Hogans would not be able to perform his previous work but that there were other jobs

available in the national economy which an individual with Hogans' limitations could still

perform, including mailroom clerk, interoffice messenger, certain assembly jobs, cashier, and

surveillance monitor. (Tr. 88-91.) On cross-examination Mr. Pasternak testified that a

surveillance monitor would have to be capable of constant alertness (Tr. 95) and that someone

who was unable to concentrate due to frequent and constant dizziness and headaches would not be able to be a surveillance monitor. (Tr. 101-04.)

## II. Discussion

### A. Scope of Review

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Thus, if the Commissioner's decision is supported by substantial evidence and there are no other legal or procedural deficiencies, her decision must be affirmed. The Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla[;] [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

Nonetheless, the "substantial evidence" test applies only to the Commissioner's <u>factual</u> determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"] standard of review is inapplicable, however, to the [Commissioner's] conclusions of law.").

Accordingly, the Commissioner's legal conclusions and compliance with applicable regulatory and statutory mandates are reviewed de novo.

      B.     Disability Determination

In order to qualify for disability insurance benefits, a claimant must be deemed "disabled" as the term is defined in 42 U.S.C. §§ 423(d)(1)(A). A person is "disabled" when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). A "physical or mental impairment" consists of "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic technique." 42 U.S.C. §§ 423(d)(3). An individual shall be determined to be under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A).

The Commissioner determines whether a claimant meets the statutory definition of "disabled" in five successive steps. *See* 20 C.F.R. § 416.920 (1996); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). These steps may be summarized as follows:

> (1)    Is the claimant gainfully employed? If she is, then she is not disabled. If she is not, then the analysis proceeds to the second step.

> (2)    Does the claimant have a "severe" impairment(s) – i.e., one that significantly limits her physical or mental ability to do basic work activities? If she does not, then she is not disabled. If she does, then the analysis proceeds to the third step.

(3)     Does the claimant's impairment(s) meet or equal a "listed impairment?" If it does not, then the analysis proceeds to the fourth step. If it does, then she is disabled.

(4)     Does the claimant's impairment(s) prevent her from doing her "past relevant work?" If it does not, then she is not disabled. If it does, then the analysis proceeds to the fifth and final step.

(5)     Does the claimant's impairment(s), considered in conjunction with her residual functional capacity, age, education, and past work experience, prevent her from engaging in other substantial gainful work reasonably available in the national economy? If it does not, then she is not disabled. If it does, then she is disabled.

*Id.* The burden of proving disability is on the claimant for the first four steps of this analysis. *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). However, "once the claimant has established a prima facie case that his impairment prevents his return to his prior employment, it then becomes incumbent on the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training." *Id.*

In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.927(d). These rules indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. *Id.* at § 416.927(d)(1) - (6). However, the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the claimant's] case record." *Id.* at § 416.927(d)(2). Nonetheless, certain ultimate conclusions remain the exclusive province of the Commissioner. These include the ultimate determinations of whether a claimant is disabled, whether a claimant's impairment(s) meets or equals a "listed impairment," a claimant's RFC, and the final assessment of vocational factors in relation to the claimant's impairments. *Id.* at §§ 416.927(e)(1) - (2).

### C.    The ALJ's Determination

In performing his analysis, the ALJ found that Hogans had not performed substantial gainful employment since the alleged disability onset date, satisfying step one. (Tr. 15.) The ALJ found that Hogans suffered from the severe impairments of hypertension and a likely seizure disorder during the review period, satisfying step two, but that such impairments did not qualify for any listing in Appendix 1 to subpart P of Regulation No. 4. (Tr. 17.) The ALJ then made a determination as to Hogans' RFC, finding that Hogans was capable of performing less than a full range of heavy work, with his seizure disorder constituting a non-exertional impairment that did not affect his ability to walk, sit, stand, lift or carry objects but which barred him from working around heights or moving machinery and from driving. (Tr. 18-19.) At step four of the analysis, the ALJ relied on the determination by Hogans' prior employer that he was no longer capable of performing his duties as a sanitation worker in finding that Hogans could not return to his prior employment. (Tr. 19.) At step five, the ALJ relied on the Medical-Vocational Guidelines and the testimony of the vocational expert in holding that Hogans' residual ability to perform less than a full range of heavy work allowed him to perform several jobs in the national economy categorized as light or sedentary work, including mail room clerk, interoffice messenger,

assembler, cashier, and surveillance system monitor. (Tr. 19-20.) The ALJ therefore concluded that Hogans was not disabled at any time during the review period. (Tr. 20.)

Plaintiff does not contest the ALJ's findings in steps one and two that Hogans was not engaged in gainful employment and that he suffered from the severe medically determinable impairments of seizures and, since 1999, hypertension. However, Plaintiff argues that the ALJ improperly held that Hogans' seizure disorder did not meet a listed impairment, that he failed to properly analyze Hogans' RFC at step four, and that he erred in holding that Hogans was not disabled because he could still perform a variety of jobs in the national economy. These arguments are addressed in turn below.

### 1.     Listed Impairment

Plaintiff argues that the ALJ erred in holding that Hogans' seizure disorder did not meet the listing requirement for epilepsy.[2] The current regulations setting forth the listed impairments contain the following description of epilepsy:

11.00 Neurological

A. Epilepsy. In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

---

[2] Plaintiff also argues that the ALJ erred in holding that a diagnosis of seizure disorder was never established. However, despite his comments that "a precise definition for [Hogans'] blacking out remained elusive" and that "no definitive diagnosis was ever reached," the ALJ concluded that Hogans' symptoms were "most likely...the result of a seizure disorder" and assumed such a diagnosis for the remainder of his decision (see, e.g., Tr. at 18, referring to Hogan's "medically determinable impairment, a seizure disorder...."). Thus, the Court finds no error on this point.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individuals is following prescribed epileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken

***

11.02   Epilepsy - convulsive epilepsy (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than one a month, in spite of at least 3 months of prescribed treatment. With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R., Part 404, Subpart P, App. 1. At the time that the ALJ made his decision, the

governing regulations also included a requirement that the epilepsy be documented by at least

one EEG. *See* 67 Fed. Reg. 20018 (2002); *Castillo v. Barnhart*, 2003 U.S. Dist. LEXIS 13933,

at *25 n.3 (S.D.N.Y. Aug. 11, 2003). The ALJ noted the absence of any EEG verification of

Hogans' seizure disorder as one reason why his impairment did not meet the 11.02 listing

requirements. The new listing definitions became effective on May 24, 2002, after the date of

the ALJ's decision but prior to the Appeals Council's denial of review. While the amended

regulations are silent as to how they should be applied to cases under review, the SSA has on

other occasions indicated that Federal courts are to apply the rules in place at the time of the

Commissioner's "final decision," which in this case occurred on December 19, 2003, when the

Appeals Council denied Plaintiff's request for review. *See Kittles v. Barnhart*, 245 F. Supp. 2d

479, 490 (E.D.N.Y. 2003) (Dearie, J.) (quoting the SSA as requiring that the final rules for child

disability determinations be applied to "claims that are pending at any stage of [the]

administrative review process," which included Appeals Council review); *Smith v. Barnhart*, 293 F. Supp. 2d 252, 255 (E.D.N.Y. 2003) (Spatt, J.) (holding that the Commissioner's decision becomes final after the Appeals Council either grants a plaintiff's request for review and issues its own decision or denies the request for review and allows the ALJ's decision to stand). As the new listing definitions went into effect prior to the Appeals Council's decision, and as the Appeals Council specifically stated in its decision that it "applied the laws, regulations and rulings in effect as of the date [of] this action" (Tr. 4.), this Court's review must be made under the new regulations. Therefore, the lack of EEG documentation of Hogans' seizures does not prevent Hogans' impairment from qualifying under listing 11.02.

If the absence of an abnormal EEG were the only basis for the ALJ's determination at the third step of the analysis, this Court would have to find that it was not supported by substantial evidence. However, the ALJ also relied on the fact that Hogans told the Medical Board in September 1984 that he was only experiencing "blackouts" or seizures at the rate of approximately ten per year since taking Dilantin, his prescribed anti-seizure medication, which is less frequent than the twelve per year required by section 11.02. (Tr. 18.) Plaintiff argues that Hogans did experience the requisite number of seizures based on two medical reports: one by Dr. Rosenblum in March 1982, where he reports that Hogans told him that he averaged twenty blackouts a year since his injury in 1980, and one by Dr. Schechter in 2001, in which he states that, by his own report, Hogans had 5-6 seizures a week following the 1980 injury, even while on Dilantin, and still averaged two seizures a week in 2001. The ALJ discussed Dr. Schechter's opinion at length and noted his conclusion that Hogans' impairment met the listing requirements in section 11.02. However, the ALJ found that Dr. Schechter's conclusions were not supported by other evidence in the record or by his own medical findings. Indeed, there is no other record

evidence of Hogans ever experiencing seizures at a near daily frequency, as reported by Dr. Schechter. As Dr. Schechter was not Hogans' treating physician and only examined him once, some twenty years after the onset of his symptoms, the ALJ's decision to accord his opinion little weight was not error. Further, Hogans' reports of bi-weekly seizures in 2001 cannot be used to meet the listing definitions in section 11.02 because Hogans admitted that he was not taking Dilantin at the time and had not taken it regularly since he retired in 1984. Adherence to a prescribed course of anti-epilepsy treatment is an explicit requirement under section 11.02. *See* 20 C.F.R., Part 404, Subpart P, App. 1.

As for Dr. Rosenblum's report, it was made close in time to the events in question and would, if uncontradicted, meet the frequency minimums of section 11.02. However, as noted by the ALJ, in September 1984 Hogans reported to the Medical Board that his seizures were less frequent than he had stated two years earlier in 1982, occurring only ten times per year on a consistent regimen of Dilantin. (Tr. 315.) Also in 1984, Dr. Sencer reported that Hogans had experienced "at least 10-12 episodes of unconsciousness" since his last visit in September 1981, over two and a half years earlier. (Tr. 147.) Acknowledging that this range likely under-represents the frequency of Hogans' seizures by some degree, it still supports the ALJ's conclusion that the severity of Hogans' impairment did not meet the listing requirements. Thus, the ALJ's determination that Hogans' disability did not meet the listing requirements of section 11.02 is supported by substantial evidence.

2.    Past Relevant Work

Plaintiff argues that the ALJ erred at step four of the analysis by accepting the judgment

of the Sanitation Department that Hogans could not return to his previous work as a sanitation worker instead of making an independent determination by comparing his RFC to the demands of his prior job. Even if this was error, it was harmless, as it is clear that Hogans could no longer perform the demands of his job as a sanitation worker, which required him to work around heavy machinery and to drive the garbage trucks. Plaintiff focuses solely on the driving aspect to emphasize the limiting effects of that restriction, but even if the driving were not an issue the need to work with heavy moving machinery would violate one of the environmental restrictions included by the ALJ in Hogans' RFC. (Tr. 18.) Moreover, the vocational expert testified at the hearing that the job of garbage collector as it is generally performed requires very heavy exertional capacity, which is more than Hogans would be able to withstand based on his RFC. (Tr. 86.) As Hogans would have been unable to perform the job of sanitation worker either as he actually performed it before he was retired or as it is performed in the national economy, the ALJ did not err in finding that he could not return to his past relevant work. *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) ("[I]n the fourth stage of the...inquiry, the claimant has the burden to show an inability to return to [his] previous specific job and an inability to perform [his] past relevant work generally."); SSR 96-8p, 1996 SSR LEXIS 5, at *10-11.

Plaintiff also implies that the ALJ erred in not considering whether Hogans could have returned to his previous work as a mail carrier. However, an ALJ will only consider work performed within fifteen years as past relevant work, and as Hogans worked as a mail carrier prior to commencing work as a sanitation worker in 1972, his work as a mail carrier was more than fifteen years removed at the start of the review period in 1989. *See* 20 CFR § 404.1565. Thus, the ALJ properly did not consider his mail carrier position as past relevant work to which he could return.

3.     RFC Analysis and Available Jobs in the National Economy

Plaintiff makes several arguments regarding the ALJ's determination at step five that Hogans retained the RFC to perform a range of jobs available in the national economy, including mail room clerk, interoffice messenger, assembler, cashier, and surveillance system monitor.

a.     Exertional Limitations

Plaintiff argues that the ALJ erred in finding that Hogans was capable of performing work requiring light and medium exertion. Plaintiff argues that the ALJ either ignored or underestimated the disabling impact of Hogans' hypertension, subjective complaints of headaches and dizziness, and the danger of him falling down when his seizures caused him to lose consciousness. Plaintiff further argues that Hogans' inability to drive represents an exertional limitation that the ALJ did not take into account in performing the RFC.

With respect to Hogans' hypertension, the ALJ did consider the impairment, and even categorized it as severe. (Tr. 17.) However, the ALJ concluded that it did not meet or equal one of the listed impairments. (*Id.*) As Plaintiff has failed to make any reference to a hypertension listing that would be met by Hogans' impairment, solely manifested through high blood pressure readings on two occasions, and as this Court has been unable to find any such applicable listing, the Court can find no error with the ALJ's decision on this point. Moreover, despite the fact that Hogans apparently died from complications stemming from his high blood pressure, Plaintiff presented no evidence that Hogans suffered any disabling symptoms during his lifetime that affected his ability to work. *See Ptak v. Heckler*, 1984 U.S. Dist. LEXIS 15623, at *4 (D. Mass. 1984) ("Evidence of a physical impairment is not enough to warrant an award of disability benefits; the plaintiff must show she is unable to engage in any substantial gainful activity by

reason of such impairment."); 42 U.S.C. §§ 423(d)(1)(A) (including inability to engage in substantial gainful activity as a result of a medical impairment in the definition of "disabled"). Neither Dr. Patterson-Marshall, who diagnosed Hogans with hypertension in 1999, nor Dr. Schecter, who made the same diagnosis in 2001, made any findings that his high blood pressure impacted his ability to work. (Tr. 161-62, 300-05.) The testimony from the medical expert that Hogans' seizures may have been TIA's brought on by his elevated blood pressure was self-proclaimed speculation and was not binding on the ALJ. (Tr. 58, 60, 62, 64.) Finally, Hogans' failure to seek medical treatment for his hypertension despite orders by both doctors to do so precludes Plaintiff from using that impairment to obtain a finding that Hogans was disabled, as the governing regulations require that a claimant follow prescribed treatment for his impairment in order to get benefits, unless there is a good reason for not doing so, such as where the treatment was ineffective. *See* 20 C.F.R. § 404.1530(a)-(b); *Jefferson v. Barnhart*, 2004 U.S. Dist. LEXIS 5279, at *30 (S.D.N.Y. Mar. 31, 2004). As there is no evidence in the record that Hogans ever obtained any medication for his high blood pressure, Plaintiff cannot now argue that such treatment would have been ineffective. Finally, even if Hogans' hypertension impairment properly factored into the ALJ's RFC analysis, the only evidence in the record as to how the hypertension might have impacted Hogans' ability to work came from the medical expert at the hearing, who postulated that it would result in the same non-exertional limitaitons as his seizure disorder. (Tr. 82-83.) Thus, the impairment would have had no impact on the ALJ's analysis of Hogans' exertional abilities.

Plaintiff also argues that the ALJ overlooked limitations resulting from Hogans' subjective complaints of headaches and periods of dizziness. The Second Circuit has held that it is the function of the ALJ, and not the reviewing courts, "to resolve evidentiary conflicts and to

appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (quoting *Carroll v. Sec'y, Dep't of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1982)). Thus, so long as the ALJ's decision to discount a claimant's subjective complaints of pain is supported by substantial evidence, the Court must uphold that determination. *Aponte*, 728 F.2d at 591; *Truesdale v. Barnhart*, 2004 U.S. Dist. LEXIS 1685, at *20-21 (S.D.N.Y. Feb. 6, 2004). Here, the ALJ determined that Hogans' complaints of debilitating headaches were not entirely credible in light of the conservative nature of the treatment he received, which included no apparent treatment after his retirement in 1984, the fact that his seizures were controlled, though not eliminated, by Dilantin treatment, and the fact that Hogans continued to engage in a broad range of daily activities, including visiting the local race track. (Tr. 18.) The ALJ properly considered Hogans' complaints in light of the factors set forth in the governing regulations, which include a claimant's daily activities, medication and treatment, and other measures taken by a claimant to relieve pain. *See* 20 CFR § 404.1529(c)(3)(i-iv). Moreover, while the record evidence is not conclusive on issues such as Dilantin effectiveness, the Court finds that the ALJ's determination to discount Hogans' subjective complaints of pain is supported by substantial evidence.

Plaintiff also argues that the potential for Hogans to fall and injure himself when his seizures caused him to lose consciousness calls for a conclusion that Hogans was at most capable of performing sedentary work, as such work would allow him to be closer to the ground for a greater part of the day and therefore prevent greater injury if he suffered a blackout. However, there is no evidence in the record that Hogans was incapable of standing for the six hours required for medium work and no medical opinion that he should perform work only while seated. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (holding that it was proper

for the ALJ to rely on the absence of medical findings indicating that plaintiff was unable to sit for prolonged periods of time in finding her capable of performing sedentary work); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."). Moreover, when questioned by Plaintiff's counsel about whether Hogans' blackouts would prevent him from safely standing alone in a room near sharp objects, the medical expert testified that it would not. (Tr. 79-80.) Further, as discussed in the next section, the potential for loss of consciousness as a result of a seizure disorder is generally considered a nonexertional limitation which affects the ability perform at all exertional levels and thus would not limit Hogans' exertional capabilities to sedentary work.

Plaintiff further argues that the ALJ erred in holding for purposes of the RFC analysis that Hogans had transferable skills from his work as a sanitation worker. Indeed, this was inaccurate, as the vocational expert testified that Hogans' only transferable skill was driving (Tr. 87), which all parties concede Hogans could no longer do, and the ALJ did not specify any other transferable skills that he had reason to believe Hogans possessed. Nonetheless, the error was harmless, as (1) the Medical-Vocational Guidelines direct a result of "not disabled" for someone with Hogans' remaining RFC criteria regardless of the transferability of their skills and (2) the ALJ did not include his finding that Hogans had transferable skills in the hypothetical he presented to the vocational expert and thus the expert's testimony could not have relied upon the erroneous finding in reaching his determination.

Finally, Plaintiff argues that the driving preclusion represents an exertional impairment because it affects Hogans' ability to sit and to push and pull arm and leg controls. While in some cases a claimant's inability to drive may be due to immobility or lack of motor control, which

would constitute exertional limitations, in this case there is no indication that Hogans was physically impaired in any of those ways. Rather, the driving restriction stemmed from the possibility that Hogans would have a seizure while driving and lose consciousness. Such deficiencies in concentration and alertness are categorized as nonexertional limitations. *See* 20 CFR 404.1569a(c). The driving restriction would not, therefore, impact the exertional component of Hogans' RFC.

Thus, there is substantial evidence supporting the ALJ's determination that Hogans was capable of performing jobs requiring light and medium exertional capacity.

b.    Nonexertional Limitations

Plaintiff argues that the ALJ improperly resorted to the Medical-Vocational Guidelines (20 CFR, Part 404, Subpart P, Appendix 2) to determine whether Hogans was disabled because he suffered from significant nonexertional limitations that prevented him from performing the full range of jobs included within any exertional capacity in his RFC. The Second Circuit has held that "if the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). However, when a claimant's nonexertional limitation "significantly diminishes" a claimant's work capacity in that it "so narrows his possible range of work as to deprive him of a meaningful employment opportunity," an ALJ may not rely solely on the guidelines but must instead conduct an individualized assessment of the claimant's RFC to perform available jobs in the economy by obtaining the testimony of a vocational expert. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Bapp,* 802 F.3d at 605-06); *Bentinez v. Apfel*, 1998 U.S. Dist. LEXIS 12264, at *18-19 (E.D.N.Y. July 15, 1998) (Dearie, J.).

Plaintiff argues that Hogans' seizure disorder and attendant symptoms are nonexertional impairments that significantly limited Hogans' ability to perform jobs at every functional capacity level. However, SSR 85-15 states that a claimant with a seizure disorder who is restricted only from working around heights and dangerous machinery "is an example of someone whose environmental restriction does not have a significant impact on work that exists at all exertional levels." 1985 SSR LEXIS 20, at *22; *see also Bentinez*, 1998 U.S. Dist. LEXIS 12264, at *18-19 (holding that the prohibition from operating machinery or working around heights attendant to claimant's seizure disorder had a "negligible" impact on his capacity for medium work and, thus, that the ALJ's application of the Medical-Vocational Guidelines was proper).

Plaintiff argues that Hogans had an additional nonexertional impairment not noted in this guideline -- an inability to drive -- and that this limitation effectively eliminated all available jobs because Hogans would have been unable to commute to them. In support, Plaintiff cites *Lopez Diaz v. Sec. of HEW*, 585 F.2d 1137, 1140 (1st Cir. 1978). In *Lopez Diaz*, the First Circuit addressed the issue of when a claimant's ability to travel to and from work should factor into the ALJ's RFC analysis. The court held that when a claimant "asserts that his locomotive disabilities render it impossible, or extremely difficult, for him to physically move his body from home to work....[h]is 'commuting problems' are no longer extrinsic to his disabilities; they are a direct result of them." *Id.* However, the court then limited this holding by stating that where "the disabilities of the...claimant would not in and of themselves prevent him or her from travelling by some normally available means of transportation, public or private, to 'work which exists in the national economy,' then [the] claimant...cannot be deemed disabled on incapacity to travel grounds." *Id.* at 1142 (citation omitted). There is no indication anywhere in the record that

Hogans was nearly immobile, confined to his home, or incapable of either walking or taking public transportation to his employment. In fact, Hogans told Dr. Patterson-Marshall that he would often go to the local racetrack, which would presumably require some means of transportation. (Tr. 161.) It therefore appears that while Hogans clearly could not work at any job that involved driving, his driving restrictions would not affect his ability to commute to the jobs specified by his RFC. Thus, the ALJ properly relied on the Medical-Vocational Guidelines to find that Hogans' RFC indicated a finding of "not disabled."

### 4. Questioning of the Vocational Expert

Even if this Court were to find that the ALJ was required to obtain the testimony of a vocational expert in addition to relying on the guidelines, there was no error because the ALJ did obtain such testimony. Plaintiff argues that the ALJ erred in positing his hypothetical question to the vocational expert because he omitted impairments and inaccurately described Hogans as a younger individual, thereby invalidating the expert's testimony regarding available positions in the national economy that Hogans would be able to perform. It is true that a "hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony." *Bosmond v. Apfel*, 1998 U.S. Dist. LEXIS 19078, at *23 (S.D.N.Y. Dec. 8, 1998) (citing *De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984)); *see also Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) ("The vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job."). The legal standard against which the ALJ's hypothetical must be measured is whether there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion."

*Renna v. Barnhart*, 2003 U.S. Dist. LEXIS 7402, at *10 (E.D.N.Y. May, 23, 2003) (Block, J.) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)).

In this case, there was substantial evidence to support the impairments included by the ALJ in his hypothetical to the vocational expert. The ALJ was not required to include Hogans' subjective complaints of dizziness and headaches in the hypothetical because he found that they were not entirely credible and therefore did not have a significant impact on Hogans' RFC. Nor did the ALJ err in not including Hogans' hypertension in his hypothetical, as any symptoms resulting from his hypertension mirrored those caused by the seizure disorder, which were included in the hypothetical. As for the power tools limitation testified to by the medical expert, it might have been better if the ALJ had included it in the hypothetical, but as Dr. Willer only mentioned this limitation in passing, after testifying that all he "could say for sure is that [Hogans] could not drive or work around heights" (Tr. 59), and as no other medical report in the record includes a limitation on working with power tools beyond the more general restrictions against working around heavy moving machinery, the Court cannot say that the exclusion of this limitation was not supported by substantial evidence.

The ALJ most likely did err in posing a hypothetical question involving a younger individual. While Hogans was 49 at the start of the review period, he turned 50, which constitutes "approaching advanced age" in 1990, 55 ("advanced age") in 1995, and 60 ("approaching retirement age") in 2000, all within the review period. Thus, the ALJ should have asked the vocational expert whether his conclusions as to the work available to Hogans would change based on his advancing age throughout the review period. Nevertheless, because the ALJ found that Hogans had an exertional capacity for medium work, which the Medical-Vocational

Guidelines note is unaffected by advancing age, the Court finds that this error was harmless and that this incompleteness does not invalidate the vocational expert's testimony.

III.    Conclusion

Because the ALJ's opinion contains no legal errors requiring remand and is supported by substantial evidence, the Commissioner's motion for judgment on the pleadings is granted.

**SO ORDERED**.

/s/

/ SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE

Dated:          April 27, 2005
                Brooklyn, NY